[Nos. A139939, A142253, A143702. First Dist., Div. Four. Feb. 8, 2016.]

In re E.R. et al., Persons Coming Under the Juvenile Court Law.
MENDOCINO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
J.R. et al., Defendants and Respondents;
Rafael H., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

---

[*]Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I.

**COUNSEL**

Seth Gorman, under appointment by the Court of Appeal, for Defendant and Appellant.

Douglas L. Losak, Acting County Counsel, and Rachel M. Bavis, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Defendants and Respondents.

**OPINION**

**REARDON, J.**—These consolidated dependency appeals involve the proper application of those portions of the Indian Child Welfare Act of 1978 (ICWA), 25 United States Code section 1901 et seq., which delineate the rights of a designated Indian custodian. Rafael H.—a maternal uncle who became the minors' Indian custodian shortly before the commencement of these proceedings—argues that the juvenile court made numerous errors based on its initial failure to recognize his Indian custodian status under federal law.[1] Specifically, Rafael claims that he was not given the mandatory ICWA notices and related advisements required for an Indian custodian; that active efforts were not provided to him in order to prevent the breakup of the

---

[1] Pursuant to the ICWA, 25 United States Code section 1903(6), an Indian custodian is defined as "any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child."

Indian family as required by the ICWA; that the juvenile court's detriment finding in response to his request for custody of the children was defective under the ICWA; and that, to the extent any of these issues are deemed forfeited, he was provided ineffective assistance of counsel. In two subsequent appeals, Rafael additionally disputes the propriety of the juvenile court's April 2014 and October 2014 permanent plan orders maintaining the minors in long-term foster care.[2]

Although the juvenile court failed to promptly investigate and confirm Rafael's Indian custodian status in this matter, we conclude that any errors in that regard were harmless under the specific facts of this case. In particular, we find that the mother (mother) revoked Rafael's Indian custodianship in January 2013, only three months after the commencement of these proceedings.[3] Seeing no error requiring reversal of any of the challenged findings and orders, we affirm.

## I. BACKGROUND[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## II. DISCUSSION

### A. *Status of the Indian Custodian*

 Congress enacted the ICWA in 1978 "in an effort to protect and preserve Indian tribes and their resources." (*In re G.L.* (2009) 177 Cal.App.4th 683, 690 [99 Cal.Rptr.3d 356] (*G.L.*); see 25 U.S.C. § 1901.) Specifically, the ICWA codifies "the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . ." (25 U.SC. § 1902.) Thus, " '[t]he ICWA presumes it is in the best interests of the child to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations, a most important resource.' " (*Guardianship of D.W.* (2013) 221 Cal.App.4th 242, 249 [164 Cal.Rptr.3d 414] (*D.W.*).) In order to best effectuate these policies, the ICWA is construed in accordance with "the canon of construction that statutes enacted for the benefit of Indians are to be liberally construed to their benefit." (Guidelines for

---

[2] On our own motion, we consolidated these three matters for decision on June 25, 2015.

[3] The parties were given the opportunity to file supplemental briefing on this issue, and both filed letter briefs with this court in July 2015.

[*] See footnote, *ante*, page 866.

State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed.Reg. 10146, 10150 (Feb. 25, 2015) (Guidelines); see also *In re Jack C.* (2011) 192 Cal.App.4th 967, 977 [122 Cal.Rptr.3d 6] [the ICWA "shall be liberally construed to effectuate its purposes and preferences"].)

■ As stated above, the ICWA defines an Indian custodian as "any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child." (25 U.S.C. § 1903(6); see also Welf. & Inst. Code, § 224.1, subd. (a)[8] [adopting the ICWA's definition of Indian custodian in California].) The Indian custodian concept was added to the ICWA "to recognize and protect the practice of parents in many Indian communities who entrust their children temporarily to the care of extended family members and to mandate that such entrustment does not constitute abuse or neglect." (*Ted W. v. State of Alaska* (Alaska 2009) 204 P.3d 333, 338, fn. omitted (*Ted W.*).) As explained in the House report on the ICWA: "[B]ecause of the extended family concept in the Indian community, parents often transfer physical custody of the Indian child to such extended family member on an informal basis, often for extended periods of time and at great distances from the parents. While such . . . custodian[s] may not have rights under State law, they do have rights under Indian custom which this bill seeks to protect, including the right to protect the parental interests of the parents." (H.R.Rep. No. 95-1386, 2d Sess. (1978), reprinted in 1978 U.S. Code Cong. & Admin. News, pp. 7530, 7543; see *G.L., supra,* 177 Cal.App.4th at p. 691.)

■ Under the ICWA, an Indian custodian "stands in the shoes of the parent and enjoys favored status." (*G.L., supra,* 177 Cal.App.4th at p. 692.) Thus, for instance, an Indian custodian—like a parent or the Indian child's tribe—is entitled to notice of any involuntary child welfare proceeding involving foster care placement of, or termination of parental rights to, the Indian child. (25 U.S.C. § 1912(a); Welf. & Inst. Code, § 224.2, subd. (a); rule 5.481(b).) Further, the Indian custodian has the right to intervene at any point in such a proceeding, and the notice provided must apprise the Indian custodian of that fact.[9] (25 U.S.C. §§ 1911(c), 1912(a); § 224.2, subd. (a)(5)(G)(i); rule 5.482(e).) Additional rights afforded the Indian custodian include the right to court-appointed counsel if indigent and the right to an additional 20 days to prepare for the proceeding. (25 U.S.C. § 1912(a) & (b); § 224.2, subd. (a)(5)(G)(iii) & (v); rule 5.482(a)(3).)

---

[8] All statutory references are to the Welfare and Institutions Code unless otherwise indicated. All rule references are to the California Rules of Court.

[9] "Allowing an Indian custodian to intervene 'is necessary because foster care placements and/or termination of parental rights proceedings may forever alter the custodial rights of the Indian custodian and Congress believed it important that Indian custodians be treated similarly [to] parents in child custody proceedings.' " (*G.L., supra,* 177 Cal.App.4th at p. 692, fn. 2.)

■ Moreover, before a minor subject to the ICWA can be placed in foster care, the court must make "a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (25 U.S.C. § 1912(e); see Welf. & Inst. Code, §§ 224.6, 361, subd. (c)(6), 361.7, subd. (c); rule 5.484(a).) And, finally, "[a]ny party seeking to effect a foster care placement of . . . an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[10] (25 U.S.C. § 1912(d); §§ 361, subd. (d), 361.7, subd. (a); rule 5.484(c).) With these statutory mandates in mind, we turn to the facts of this particular case and will review independently the issues of statutory interpretation raised. (*In re R.C.* (2011) 196 Cal.App.4th 741, 748 [126 Cal.Rptr.3d 418]; cf. *Ted W., supra,* 204 P.3d at p. 336.)

Here, mother executed a "Designation of Indian Custodian" (Designation) on October 4, 2012, several days before the minors were taken into protective custody by the Mendocino County Health and Human Services Agency (Agency). The Designation was revocable by its express terms and transferred temporary care and custody of the minors to Rafael as their Indian custodian under the ICWA. The record in this case reveals that the Agency was made aware of the existence of the Designation on the same day that it was executed, when the Cloverdale Rancheria ICWA Representative (ICWA Representative) told the social worker that mother and Rafael had stopped by her office and dropped off the signed document. The ICWA Representative, however, further informed the social worker that the tribe would not recognize the Designation because they were not involved with it and mother did not have an ICWA representative sign it.

■ We disagree with the Cloverdale Rancheria of Pomo Indians (Cloverdale Rancheria) that the Designation executed by mother and Rafael in this case was insufficient to establish Rafael as the minors' Indian custodian. In fact, the statutory authority for designation of an Indian custodian does not even require a writing, and such temporary transfers to extended family are often done on an informal basis. (*G.L., supra,* 177 Cal.App.4th at p. 693.) We thus conclude that—as an Indian person "to whom temporary physical care, custody, and control [had] been transferred by the parent"—Rafael became

---

[10] With respect to "active efforts," section 361.7, subdivision (b), provides as follows: "What constitutes active efforts shall be assessed on a case-by-case basis. The active efforts shall be made in a manner that takes into account the prevailing social and cultural values, conditions, and way of life of the Indian child's tribe. Active efforts shall utilize the available resources of the Indian child's extended family, tribe, tribal and other Indian social service agencies, and individual Indian caregiver service providers."

the Indian custodian of the minors for purposes of the ICWA on October 4, 2012. (25 U.S.C. § 1903(6).)

Unfortunately, although the Agency was made aware of the Designation on the day it was executed, it did nothing to verify or implement its contents, perhaps relying on the Cloverdale Rancheria's conclusion that the document was invalid. Moreover, the existence of the Designation was reported in the social worker's case notes attached to the Agency's October 12, 2012, detention summary. Yet neither the juvenile court nor any of the parties raised the issue of Rafael's status until Rafael finally provided the court with a copy of the Designation over four months later, on February 19, 2013. Under these circumstances, we believe it was error for the Agency and the juvenile court not to have inquired further with respect to the import of the Designation at the commencement of these proceedings.

However, our review of the record further reveals that, on January 16, 2013, mother spoke with the social worker by telephone from her residential treatment center. During that conversation, mother told the social worker that she wanted her children to remain in foster care rather than being placed with Rafael because there were drugs at the house, Rafael did not have a car, and she did not want her children living with Rafael. Specifically, she stated: " 'There are drugs on that property, and I want my kids safe, away from all of that, and the drugs.' " Mother contacted the social worker from residential treatment a second time on February 4, 2013, reiterating her position and noting that " 'living out there was a bad situation with me, and I don't want that for the kids.' "[11]

■ Under strikingly similar circumstances, the Supreme Court of Alaska recently concluded that—by informing the child welfare agency of their opposition to their dependent children being placed in the Indian custodian's care—the parents acted to terminate the Indian custodianship. (*Molly O. v. State of Alaska* (Alaska 2014) 320 P.3d 303, 308–309 (*Molly O.*) [by telling the child welfare agency "that they did not want their children placed with

---

[11] These unequivocal statements of mother's intent, though hearsay, were included in the social worker's interim review report for the February 19, 2013, hearing and were therefore properly before the juvenile court. (*In re Malinda S.* (1990) 51 Cal.3d 368, 376–377 [272 Cal.Rptr. 787, 795 P.2d 1244], superseded by statute on another ground as stated in *In re Lucero L.* (2000) 22 Cal.4th 1227, 1240–1242 [96 Cal.Rptr.2d 56, 998 P.2d 1019]; see also *In re M.B.* (2011) 201 Cal.App.4th 1057, 1061 [134 Cal.Rptr.3d 45]; rules 5.690(b), 5.708(c)(3).) Indeed, they were corroborated by mother's own counsel, who stated at the February 19 hearing: "I spoke with my client on the 15th just last week, and she indicated to me that she no longer supports placement with her brother and she wants to see the children remain where they are. So I am withdrawing my request for placement with the uncle at this time." In determining the legal significance of these statements under the ICWA, we are not, as Rafael suggests, engaged in impermissible appellate factfinding. Rather, we are drawing a legal conclusion from substantial evidence already before us in the record on appeal.

[the Indian custodian], [the parents] effectively informed [the child welfare agency] that any grant of physical care, custody, and control they may have earlier given [the Indian custodian] over their children no longer existed"].) This makes sense as "the Indian caretaker's status as an Indian custodian is derived from the temporary transfer of care of the Indian child by the parent. But Congress did not provide in ICWA that the Indian custodian could usurp the parent's right to raise the child or prevent the parent from rescinding the Indian caretaker's designation as the child's Indian custodian." (*Ted W., supra,* 204 P.3d at p. 338, fn. omitted; see *id.* at fn. 17 [noting that the ICWA does not place the Indian custodian's rights above those of the parents].) Instead, "[t]he transfer of an Indian minor's care and custody to an Indian custodian is, by definition, 'temporary,' and thus revocable." (*G.L., supra,* 177 Cal.App.4th at p. 695.) Moreover, since the establishment and maintenance of an Indian custodianship is within the exclusive power of a parent and a parent may create such a custodianship on an informal basis, we see no reason why a parent may not also extinguish that status informally, without recourse to the courts or other recognized legal process. (25 U.S.C. § 1903(6); see *G.L., supra,* 177 Cal.App.4th at p. 695.)

Further, courts in both California and Alaska have recognized a parent's authority to revoke an Indian custodianship despite the fact that a child welfare agency has intervened and taken over custody and control of the minors subject to that custodianship. As the Fourth District opined in *G.L.*: "At the time [mother] revoked [grandmother's] Indian custodian status, [mother's] parental rights remained intact and [mother] retained legal custody of G.L., even though she did not have physical custody of her. Thus, [mother] could properly revoke the transfer of G.L.'s care and custody to [grandmother]." (*G.L., supra,* 177 Cal.App.4th at p. 695; see also *Molly O., supra,* 320 P.3d at pp. 305–309 [parents' objection to placing minor children with Indian custodian during child welfare proceedings operates to revoke Indian custodianship].)

We find unavailing Rafael's attempts to distinguish this persuasive precedent because the revocations in the cited cases occurred prior to disposition. Although the juvenile court may remove a dependent minor from the *physical* custody of the parents at disposition pursuant to subdivision (c) of section 361, such parents retain many residual legal rights with respect to that child until those rights are formally terminated or otherwise curtailed. (§ 361, subds. (a) & (c); cf. *Ted W., supra,* 204 P.3d at p. 338 ["[a]s long as their parental rights have not been terminated, parents retain legal custody of their children, affording them 'the responsibility for making major decisions affecting the child's welfare' "].) In fact, pursuant to subdivision (a) of section 361, while the juvenile court may limit the control exercised by a parent over a dependent child at and after disposition, any such order must "clearly and specifically set forth all those limitations." For instance, any limitations on

the right of a parent to make educational decisions for a dependent minor must be "specifically addressed" in a court order. (*Ibid.*) And, such "limitations may not exceed those necessary to protect the child." (*Ibid.*) Thus, while the juvenile court may have had the power to limit mother's right to revoke Rafael's Indian custodianship, it did not do so in this case. (*In re J.S.* (2011) 199 Cal.App.4th 1291, 1295 [132 Cal.Rptr.3d 244] ["[t]he mere existence of authority to direct a parent's conduct in relation to his or her child does not in and of itself constitute *exercise* of that authority, and does not translate to automatic limitations on the parent's general rights absent some specific direction or order"].) Thus, mother retained the authority to revoke Rafael's special status under the ICWA despite the pendency of these proceedings.[12]

■ In contrast, when, in the present case, mother indicated through counsel on February 26, 2013, that she wanted the Designation to remain in place, she was at that point without authority to reinstate the custodial relationship that she had revoked by her actions over the previous month. This is because, at both the detention hearing on October 12, 2012, and the dispositional hearing on January 8, 2013, the Agency was given the responsibility for placement and care of the minors by the juvenile court. The dispositional orders also formally placed the minors in the care, custody, and control of the Agency. Thus, mother no longer had the ability to informally transfer "temporary physical care, custody and control" of the minors to any third party. (See 25 U.S.C. § 1903(6); see also *Molly O., supra*, 320 P.3d at p. 309 [parent "may not create or recreate an Indian custodianship" for an Indian child in the custody of a child welfare agency].) Instead, the task of determining placement in accordance with the placement preferences of the ICWA and California's dependency statutes fell on the shoulders of the Agency. (See 25 U.S.C. § 1915(b); Welf. & Inst. Code, § 361.31.) We thus agree wholeheartedly with Rafael's contention that once the Agency intervened, mother no longer had the legal authority to direct who had physical care, custody, and control of her children. ■ However, having successfully granted Rafael special status as the minors' Indian custodian under the ICWA prior to the removal of the minors by the Agency, we conclude that mother retained the power to extinguish that status.

Under these circumstances, we conclude that Rafael was the designated Indian custodian with respect to the minors only from October 4, 2012, through January 16, 2013. Indeed, an argument could be made that Rafael's Indian custodian status was even more limited. Although mother signed the Designation on October 4, 2012, the record is not clear that she actually transferred physical custody of the minors to Rafael at that time. According to

---

[12] Given the facts of this case, we need not reach the issue of whether mother could have revoked Rafael's Indian custodianship over the Agency's, or the juvenile court's, objection. (Cf. *Ted W., supra*, 204 P.3d at pp. 336, 338–339 & fn. 21.)

the Agency, the minors were removed from the home of the maternal grandmother, where mother was living. Further, the record does not reflect which adult had actual physical custody of E.R. when mother and Rafael met with the social worker at the Agency on the date of removal, and mother stated at that time that she was the one who cared for the children. Thus, despite the execution of the Designation, mother may never have transferred temporary physical custody to Rafael in accordance with its terms. (Cf. *G.L., supra*, 177 Cal.App.4th at p. 693 [parties do not dispute that G.L. was in the "exclusive custody" of the Indian custodian at the time she was taken into protective custody].)

In addition, since an Indian custodian "stands in the shoes of the parent" (*G.L., supra*, 177 Cal.App.4th at p. 692), it is not certain whether or to what extent both a parent and an Indian custodian can be actively involved in a child welfare proceeding at the same time (cf. *Ted W., supra*, 204 P.3d at p. 339, fn. 23 [identifying but not deciding the issue]). Thus, mother's actions in taking a dominant role in these proceedings and accepting reunification services—presumably with the intent to herself reunify with the minors—may also have been sufficient to revoke Rafael's designation as the minors' Indian custodian. On the other hand, we note that the interpretation of the circumstances in this case that is most favorable to Rafael and the possible preservation of the Indian family is that the minors' Indian family included both mother *and* Rafael. Ultimately, we need not decide this issue, but will presume that mother and Rafael could simultaneously possess some form of custodial rights to the minors, at least until mother clearly revoked those rights with respect to Rafael on January 16, 2013.

B. *Notice Issues*

With these conclusions in mind, we consider first Rafael's claim that this matter must be reversed and remanded for reconsideration of the juvenile court's September 4, 2013, placement decision because the Agency failed to give him the formal notice of these proceedings that was his due as the minors' Indian custodian. As mentioned previously, the ICWA's notice requirement provides: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or *Indian custodian* and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. . . . No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or *Indian custodian* and the tribe . . . ." (25 U.S.C. § 1912(a), italics added; see also Welf. & Inst. Code, § 224.2, subd. (a); Guidelines, 80 Fed.Reg., *supra*, at pp. 10153–10154.)

While the express language of the ICWA quoted above mandates notice to the parent *or* Indian custodian, both the federal Guidelines and California law provide for notice to the parent *and* the Indian custodian. (§ 224.2, subd. (a); see Guidelines, 80 Fed.Reg., *supra*, at pp. 10153–10154.) Clearly, in this case, Rafael had actual notice of the proceedings, being present at the removal of the minors and at many of the early hearings in this matter. However, it is undisputed that the Agency failed to provide the statutorily required ICWA notice to him as the minors' Indian custodian and that, as a result, he did not receive a court-appointed attorney or participate as a party in the proceedings until February 2013.

A notice violation under the ICWA, however, "is not jurisdictional in the fundamental sense, but instead is subject to a harmless error analysis." (*G.L., supra*, 177 Cal.App.4th at pp. 695–696 [listing cases].) Thus, in order to obtain a reversal for lack of proper ICWA notice, an appellant "must show a reasonable probability that he or she would have obtained a more favorable result in the absence of the error." (*G.L.*, at p. 696.) Here, Rafael was entitled to the statutory ICWA notice from the minor's removal in October 2012 until his Indian custodianship was revoked by mother on January 16, 2013. (See *G.L., supra*, 177 Cal.App.4th at p. 695 [notice provisions of the ICWA no longer apply to the Indian custodian once the custodianship was revoked].) Under the unique facts of this case, we conclude that the Agency's failure to provide the mandated notice to Rafael during this time period was harmless.

Specifically, during the timeframe at issue—October 9, 2012, through January 16, 2013—the juvenile court held three hearings in this matter: the October 12, 2012, detention hearing, the November 14, 2012, jurisdictional hearing, and mother's January 8, 2013, dispositional hearing. Even if Rafael had received ICWA notice, intervened, and had counsel appointed prior to the detention hearing, we see no probability, let alone a reasonable one, that the minors would have remained placed with him. The minors were removed from the property where both mother and Rafael lived after suffering significant neglect. The Cloverdale Rancheria was, from the start, opposed to placement with Rafael. And it was apparent to the Agency that Rafael suffered from some kind of cognitive deficit that required assessment. Under such circumstances, the evidence supporting temporary detention of the minors was overwhelming.

Similarly, significant and uncontested evidence supported the juvenile court's jurisdictional finding that mother's substance abuse placed the minors at substantial risk of harm. Indeed, mother admitted that she had been using methamphetamine since she was 12 years old and indicated at the November 2012 jurisdictional hearing that she wanted to enter drug treatment and "get her life back on track." Since dependency jurisdiction is taken over children

rather than parents, the allegations regarding mother's substance abuse and neglect of the minors were sufficient to support jurisdiction in this case. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491 [134 Cal.Rptr.3d 441]; *In re Alysha S.* (1996) 51 Cal.App.4th 393, 397 [58 Cal.Rptr.2d 494].) In particular, it was unnecessary that any additional allegations regarding Rafael be expressly asserted or proved. (See *In re Briana V.* (2015) 236 Cal.App.4th 297, 311 [186 Cal.Rptr.3d 397].) Given these facts, we find no reasonable probability that Rafael's intervention and participation through counsel at the jurisdictional hearing would have changed its outcome.

In truth, the real crux of Rafael's complaint in this matter has always been his desire to regain custody of the minors, with adequate tribal and Agency services in place to support that placement. Although Rafael did not participate as a party in the portion of the dispositional hearing which impacted mother's custodial status and reunification services, the question of his custodial rights and entitlement to services was, as we discuss further below, exhaustively considered at the September 2013 placement hearing in this matter, where Rafael was an active participant·represented by counsel. Thus, again, we find any failure to provide early ICWA notice in these proceedings harmless.

In reaching this conclusion, we are influenced by two additional factors. First, this is not a case where the juvenile court ignored the minors' Indian heritage or deprived the Cloverdale Rancheria of the right to participate in the proceedings. In fact, other than failing to recognize Rafael's Indian custodian status in the early stages of the case, the proceedings were conducted in accordance with the ICWA, the court properly applied the ICWA's substantive provisions, and placement of the minors with Rafael was denied in accordance with the request of the Cloverdale Rancheria. (Cf. *G.L., supra,* 177 Cal.App.4th at p. 696.) In addition, we cannot ignore the current procedural posture of this case, in which Rafael's Indian custodianship rights have long been extinguished. Under such circumstances, "even a conditional reversal and remand for further ICWA notice would be futile, 'an empty formality and a waste of ever-more-scarce judicial resources.' " (Cf. *G.L.,* at p. 696.)

C. *Other Compliance Issues Under the ICWA*

Rafael also argues that the juvenile court's September 2013 placement decision must be reversed because the Agency failed to make active efforts to prevent the breakup of the Indian family as required by the ICWA. (25 U.S.C. § 1912(d).) Although the juvenile court did make an active efforts finding at mother's dispositional hearing in January 2013—which it referenced at the September hearing—Rafael argues that active efforts specific to him as the minors' Indian custodian were required before the Agency could lawfully

remove the minors from his custody. In addition, Rafael faults the juvenile court for failing to make an appropriate detriment finding under the ICWA before formally removing the minors from his custody at the conclusion of the placement hearing. As stated above, before a minor subject to the ICWA can be placed in foster care, the court must make "a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (25 U.S.C. § 1912(e).) Although the juvenile court did make a detriment finding at the September 2013 hearing, Rafael argues that the standard used by the court differed from that required by the ICWA and was improper.

Indubitably, had Rafael remained the minors' designated Indian custodian, the September 2013 placement hearing would have essentially acted as a dispositional hearing with respect to Rafael, where both an active efforts and a detriment finding would have been required under California and federal law. (25 U.S.C. § 1912(d) & (e); Welf. & Inst. Code, §§ 224.6, § 361, subds. (c)(6) & (d), 361.7, subds. (a) & (c); rule 5.484(a) & (c).) However, since we have concluded that Rafael's status as the minors' Indian custodian was revoked months earlier, in January 2013, no such findings were necessary at the placement hearing. We therefore need not determine whether the findings actually made by the juvenile court would otherwise have been sufficient under the ICWA.

 Instead, as it turns out, what Rafael was really seeking at the September 2013 hearing was a preferred placement as an extended family member under the ICWA. "ICWA provides placement preferences and standards to be followed in foster care placements of Indian children." (*G.L., supra*, 177 Cal.App.4th at p. 697.) As is relevant here, "absen[t] . . . good cause to the contrary," preference for the placement of an Indian child pursuant to the ICWA must first be given to "a member of the Indian child's extended family" such as Rafael. (25 U.S.C. § 1915(b).) The Guidelines provide a number of factors to be considered in deciding whether good cause exists to diverge from the ICWA's statutory placement preferences, including (1) the request of the biological parents; (2) the request of the child; and (3) the extraordinary physical and emotional needs of the child as established by the testimony of a qualified expert witness. (Guidelines, 80 Fed.Reg., *supra*, at p. 10158.) We review a juvenile court's decision to deviate from the ICWA's placement preferences for substantial evidence. (*G.L., supra*, 177 Cal.App.4th at p. 697.)

In the present case, as our detailed review of the record in the unpublished portion of this opinion makes clear, the evidence was compelling that good

cause existed to forgo placement of these special needs children with Rafael.[13] First, the Cloverdale Rancheria, mother, the Agency, and the attorney for the minors—essentially everyone other than Rafael, himself— was opposed to Rafael obtaining custody of the children. In addition, the detailed report prepared by Dr. Singer, along with her testimony at the hearing, provided strong evidence that Rafael could not effectively parent these minors due to his significant cognitive deficits. The record also extensively chronicled the numerous and varied developmental and psychological issues faced by the children as a result of the neglect they suffered prior to their removal by the Agency. Both the juvenile court and Dr. Singer recognized that the minors would need strong and structured parenting in order to have the best chance at overcoming these early deficits, parenting that Rafael was unable to provide. Moreover, although Rafael provided evidence of his past involvement in the minors' upbringing and argued that he had proved his ability to care for them "by the fact that I cared for them very well in the past," the juvenile court concluded just the opposite, stating: "In a way, I think it's one of those proof-is-in-the-pudding things. The four children are doing very badly. To the extent that [Rafael] has been involved in their nurturing, it hasn't worked." Although we have no doubt that Rafael loves the children and is devoted to them, we find this determination, and the juvenile court's resulting placement decision, manifestly supported by the evidence.

In sum, Rafael has identified no error requiring reversal of the juvenile court's September 2013 decision denying him placement of the minors.[14]

### D. Permanent Plan Issues

In his two later appeals, Rafael disputes the propriety of the juvenile court's April 2014 and October 2014 permanent plan orders maintaining the minors in long-term foster care and regulating visitation between Rafael and the children. Specifically, he first contends that, if this court reverses the juvenile court's September 2013 placement decision due to the ICWA violations identified in his earlier appeal, we must also reverse the later

---

[13] Although the juvenile court did not make a good cause finding in this case, reversal is not required where, as here, the correct findings were amply supported by the evidence. (*In re A.J.* (2013) 214 Cal.App.4th 525, 538 [153 Cal.Rptr.3d 851]; *In re Janee W.* (2006) 140 Cal.App.4th 1444, 1450 [45 Cal.Rptr.3d 445]; see *People v. Geier* (2007) 41 Cal.4th 555, 582 [61 Cal.Rptr.3d 580, 161 P.3d 104] [appellate court reviews the correctness of the court's ruling, not its reasoning, "and, if the ruling was correct on any ground, we affirm"].)

[14] When counsel was appointed for Rafael on February 26, 2013, he was no longer the minors' Indian custodian as that status had been revoked by mother the previous month. Since we do not reject the issues raised by Rafael in his first appeal based on any possible substandard conduct by his trial attorney, we need not further consider his claim of ineffective assistance of counsel.

permanent plan and visitation orders made with respect to the minors. He also argues that the permanent placement of the four minors in long-term foster care is not "necessary and appropriate" because he stands ready, willing, and able to take custody of all four children with the assistance mandated by the ICWA.

 Given the conclusions reached in this opinion, Rafael's first argument necessarily fails. With respect to the appropriateness of the minors' permanent plans, we note that Rafael did not raise this issue in the juvenile court, and we may therefore deem it forfeited. (See *In re Dakota S.* (2000) 85 Cal.App.4th 494, 502 [102 Cal.Rptr.2d 196] [listing cases]; *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339 [63 Cal.Rptr.2d 562].) More fundamentally, however, "[o]nce an Indian custodian's status has been revoked, that person has no role in ongoing child protection proceedings." (*Molly O., supra,* 320 P.3d at p. 309; see *G.L., supra,* 177 Cal.App.4th at p. 695 [holding that the notice provisions of the ICWA no longer applied to the Indian custodian once the custodianship was revoked].) Of course, Rafael can continue to appear in the juvenile court and request visitation with the minors as an interested relative. And, indeed, the juvenile court seems very aware that Rafael is important to these minors and should remain in their lives in some capacity. Rafael, however, is no longer a party to these proceedings and therefore cannot contest the selection and maintenance of the minors' permanent plans.

## III. DISPOSITION

The juvenile court's September 4, 2013, order denying placement of the minors with Rafael is affirmed. So too are the court's April 2014 and October 2014 permanent plan orders.

Ruvolo, P. J., and Streeter, J., concurred.